UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED
2005 MAY 20 P 2:38

CLERK
BY_____
DEPUTY CLERK

| | |
|---|---|
| PROFESSIONAL CONSULTANTS INSURANCE COMPANY, A Vermont Corporation, | )<br>)<br>)<br>)<br>) |
| Plaintiff/Counter-Defendant | ) No. 1:03-cv-216<br>) |
| v. | )<br>) |
| EMPLOYERS REINSURANCE CORPORATION, a Missouri Corporation, | )<br>)<br>) |
| Defendant/Counter-Plaintiff. | ) |

## AFFIDAVIT OF RICHARD G. WATERMAN IN SUPPORT OF PCIC'S OPPOSITION TO ERC'S SINGLE LIMIT, DATE OF CLAIM AND BAD FAITH MOTIONS FOR PARTIAL SUMMARY JUDGMENT

[Filed concurrently with: (1) PCIC's Single Limit Opposition; (2) PCIC's Single Limit Responsive Separate Statement; (3) PCIC's Single Limit Compendium; (4) PCIC's Date of Claim Opposition; (5) PCIC's Date of Claim Responsive Separate Statement; (6) PCIC's Date of Claim Compendium; (7) PCIC's Bad Faith Opposition; (8) PCIC's Bad Faith Responsive Separate Statement; (9) PCIC's Bad Faith Compendium; (10) Affidavit of Stephen T. Jacobs; (11) Affidavit of David Westberg; (12) Affidavit of Julia K. Holt; (13) Affidavit of Kirk A. Pasich; (14) Affidavit of Cassandra C. Shivers; (15) Affidavit of Susan Page White; (16) PCIC's Evidentiary Objections; and 17) Certificate of Service]

## **AFFIDAVIT OF RICHARD G. WATERMAN**

I, Richard G. Waterman, declare as follows:

    1.    I am the President and principal consultant of Northwest Reinsurance, Inc., a consultant firm specializing in insurance, reinsurance, strategic initiatives, due diligence, new product development and dispute resolution. I have held this position since 1987.

    2.    I have personal knowledge of the matters contained in this declaration. If called and sworn as a witness, I would and could testify competently and from first-hand knowledge as to them.

    3.    I studied business administration at Middle Tennessee State University. I attended Concordia University and received a Bachelor of Arts degree in organizational management in 1990. I also have a Master of Arts degree in business management, which I received from Hamline University in 1993.

    4.    I also have studied and received numerous insurance-related certificates and designations. In the mid-1960s, I took courses at the College of Insurance and earned a multiple line underwriting certificate. In 1978, I earned the charter property and casualty designation from the American Institute for Chartered Property Casualty Underwriters, which I continue to maintain through participation in rigorous continuing education programs. I also have obtained an Associate in Reinsurance designation from the Insurance Institute of America.

    5.    I have 42 years of experience in the reinsurance industry. I began my career at American Re-Insurance Company in 1963 and worked there for 10 years in various management positions including Treaty Underwriting, Property Facultative and Casualty Facultative Underwriting, Accounting and Claims. In 1973, I became Vice President and Chief Operating Officer of the Reinsurance Division and Director of Ceded

Reinsurance at Scottish and York International Group. In 1982, when GRE-RE of America Corp. purchased the reinsurance division formally owned by Scottish and York, I became the President and Chief Executive Officer of the reinsurance division, as well as a Member of the Board of Directors for GRE-RE of America Corp., Atlas Assurance Company of America and Albany Insurance Company. During that time period, I was also the Senior Vice President of Atlas Assurance Company of America. In 1985, I became the Senior Vice President of E.W. Blanch Co., which is a reinsurance broker. In that position, I was responsible for all administrative functions, including accounting, claims, administration and the contract writing department. In 1987, I left to form my own reinsurance consulting business, Northwest Reinsurance, Inc. Since the formation of Northwest Reinsurance, I have been retained by more than 90 insurance-related entities to provide a wide array of insurance and reinsurance consulting services.

     6.    Over the years, I have also been involved with the following professional organizations:

     a.    Society of Chartered Property Casualty Underwriters (CPCU);

     b.    National Governing Committee, Reinsurance Section of the Society of CPCU;

     c.    American Arbitration Association National Commercial Panel of Neutrals;

     d.    American Arbitration Association Roster of Insurance Industry Umpires;

     e.    AIDA Reinsurance & Insurance Arbitration Society (ARIAS US), of which I am a Certified Arbitrator and Umpire and am Chairperson of the ARIAS Ethics Committee;

     f.    International Association of Insurance Receivers' Arbitrator Roster; and

     g.    An associate member of the American Bar Association.

7. I have served as an expert consultant and/or witness on approximately 25 insurance/reinsurance cases. I also have been appointed as an arbitrator in approximately 110 arbitrations, both as a party arbitrator and selected by my peers as a neutral umpire. In those arbitrations, approximately 50% of my appointments were on behalf of the reinsured and the other 50% were on behalf of reinsurers. Additionally, I have mediated or facilitated numerous other reinsurance industry disputes.

8. During my 42 years of experience in the reinsurance industry, I have reviewed, become familiar with, followed, and evaluated the standards, customs and practices prevalent in the reinsurance industry, including those pertaining to the underwriting of various types of reinsurance contracts and the handling of various types of reinsurance claims, including professional liability reinsurance contracts and claims.

9. I have been retained by the plaintiff in this matter, Professional Consultants Insurance Company ("PCIC"), to provide expert opinions regarding the custom and practice of the insurance and reinsurance industry with respect to certain matters which are at issue between PCIC and defendant Employers Reinsurance Corporation ("ERC"). In forming my expert opinions in this matter, I have drawn heavily on my industry experience, firsthand knowledge of industry custom and practice, and frequent service as an arbitrator and mediator to resolve industry disputes. In connection with rendering my opinion in this matter, I have reviewed each of the dozens of depositions taken in this matter and have reviewed most of the documents offered as exhibits to those depositions. I also have reviewed PCIC's Complaint, ERC's Answer and Cross-Complaint, and PCIC's Answer to the Cross-Complaint. In addition, I have reviewed ERC's three motions for partial summary judgment regarding single limit, date of claim, and bad faith.

10. The opinions I express in this Affidavit are based upon my experience outlined in paragraphs 2 through 8 above, and my review of documents outlined in paragraph 9 above.

11. During my experience in the reinsurance industry, I have become very familiar with policies and custom in the industry—that is, the custom and practice of the reinsurance industry. Reinsurance practice follows the principle of *uberrima fides*, or utmost good faith, whereby reinsurance contracts are considered honorable engagements based on mutual trust and confidence. The doctrine of utmost good faith requires candor, openness and honesty to promote fair dealings. Reinsureds fulfill their duty of utmost good faith by providing all material underwriting information to a reinsurer at the inception of the reinsurance relationship, maintaining underwriting standards, and exercising all proper and businesslike steps when settling claims that affect reinsurance coverage. Thus, the concept of caveat emptor or "buyer beware" has no place in the reinsurance industry custom and practice.

12. Industry practice also applies the principles of utmost good faith to reinsurers in recognition that both parties are required to disclose to the other those: (i) facts that are known by either party, (ii) facts that are material to the underwriting decision being requested, and (iii) facts that the other party could not be in a position to know. Because the reinsurance industry depends on a high level of good faith on the part of both the reinsured and reinsurer, disclosure is required whenever either party is aware of facts or circumstances that materially affect a reinsurance risk that the other party had no reason to know.

13. Consistent with industry custom and practice, ERC was obliged under the doctrine of utmost good faith to disclose to PCIC any perceived limitation in the reinsurance coverage provided by ERC under the terms of the 1993 Agreement. It is my opinion that the plain language of the 1993 Agreement stipulates emphatically that the reinsurance coverage pertains to each policy issued by PCIC that became effective after the effective date and prior to the termination date of the 1993 Agreement. It is also my opinion that in order to comply with the custom and practice in the reinsurance industry, if ERC intended to severely limit reinsurance coverage to one aggregate limit per insured

for the life of the 1993 Agreement, ERC would have explicitly made its intention known to PCIC when the treaty terms were negotiated and would have expressly stated the limitation of reinsurance indemnity in the 1993 Agreement. From my review of documents and depositions in this case, there are no contemporaneous documents between the parties confirming a mutual understanding that is contrary to industry custom and practice, as well as the ordinary meaning of 1993 Agreement language. And, given the course of conduct of the parties in subsequent years, it is my opinion that the 1993 Agreement affords, and in accord with reinsurance industry custom and practice should be understood to provide reinsurance indemnity for all policies issued to each insured during the period the 1993 Treaty Agreement was in effect. And, it is also my opinion that ERC's "single limit" argument, which it raised for the first time in September 2002 almost ten years after the 1993 Agreement became effective, is contrary to reinsurance industry custom, practice and standards and does not conform with ERC's obligations of utmost good faith to PCIC.

14. It is the reinsurance industry custom and practice with respect to this type of reinsurance agreement that if a reinsurance agreement is going to be non-concurrent to the reinsured contract in any respect, that area of non-concurrency should be expressly stated by the reinsurer. Thus, it is my opinion that in order to comply with industry custom and practice, if ERC intended that any of the terms or provisions of the 1993 Agreement were not to be concurrent with the reinsured policies issued by PCIC, then ERC should have disclosed that intent to PCIC during the underwriting negotiation process.

15. As part of the reinsurance industry custom and practice, a reinsured generally is expected to provide the reinsurer with timely notice of each claim made against the insurance that is subject to the reinsurance. Thus, pursuant to industry custom and practice, when one of PCIC's insureds informed it of a claim or a potential claim, or of circumstances that might give rise to a claim, PCIC would, under reinsurance industry

custom and practice, timely notify ERC of each claim that might involve the reinsurance under the 1993 Agreement. It is also reinsurance custom and practice that when the reinsured receives notice of a claim or potential claim from its insured, or the insured provides information to the reinsured regarding circumstances that might give rise to a claim, the date upon which that notice or information is provided to the reinsured is considered the date of the claim, even if the formal claim is made at some time after the initial notice date. Based on my review of the documents and depositions in this case, I believe that PCIC acted in compliance with the reinsurance custom, practice, and standards of utmost good faith in promptly notifying ERC of claims or potential claims and in setting the dates of claims on the PCIC claims, including the *LACERA* and *Hughes/Raytheon* claims.

16.    Under reinsurance industry custom, practice, and standards, reinsurers have an obligation to indemnify reinsureds for losses pursuant to the terms and conditions of the underlying policies reinsured, as well as the terms of the reinsurance agreement, and are not exempt from the doctrine of utmost good faith and fair dealing to disclose material facts that affect their reinsurance coverage. Additionally, a reinsurer is expected promptly to tell its reinsured if a claim that has been reported is not covered, or may not be covered, by the reinsurer. It is my opinion, based on my review of the documents and depositions in this case, that in order to comply with the custom and practice in the reinsurance industry, ERC's claims attorneys should have promptly informed PCIC if they felt that the dates of claim assigned to any PCIC claims, including the *LACERA*, *Hughes*, or *Raytheon* claims, were improper or, indeed, if they felt that there was any reason why PCIC claims were not covered under the 1993 or 1997 Agreements. It is also my opinion that ERC's argument that the dates of claim assigned to the *LACERA* and *Raytheon* claims are improper because they should have been assigned to later policy periods, which it raised for the first time in October 2003—over 5½ years after PCIC had first notified ERC of the claims and assigned the dates of claim—is contrary to the

reinsurance industry custom, practice, and standards and does not conform with ERC's obligation of utmost good faith to PCIC.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Affidavit is executed on the 17th day of May, 2005.

*Richard G. Waterman*

Richard G. Waterman