UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

PROFESSIONAL CONSULTANTS           :
INSURANCE COMPANY,                 :
         Plaintiff,                :
                                   :    File No. 1:03-CV-216
         v.                        :
                                   :
EMPLOYERS REINSURANCE COMPANY,     :
         Defendant.                :
_____    :

RULING ON PENDING MOTIONS
(Papers 92, 95, 98, and 138)

Plaintiff Professional Consultants Insurance Company
("PCIC") brings this diversity action for breach of contract and
tortious bad faith against its reinsurer.  PCIC seeks declaratory
relief, payment of at least $6,404,608 on claims, and punitive
damages.  (Compl., Paper 1.)  Defendant Employers Reinsurance
Company ("ERC") counterclaims for breach of contract and breach
of the duty of utmost good faith, seeking declaratory relief and
reimbursement of $3,095,392.[1]  (Ans., Paper 6.)  ERC moves by
three separate motions for partial summary judgment on all
respective counts, as well as to strike certain expert evidence.

For the reasons stated below, ERC's motions for partial
summary judgment as to the reinsurance limit (Paper 98), dates of
claim (Paper 95), and tortious bad faith (Paper 92) are DENIED;

---

[1]  ERC additionally seeks reimbursement from PCIC of $1,404,609 for a
claim by National Home not addressed in these motions for which PCIC allegedly
failed to promptly update ERC on significant developments.  (Paper 6 ¶¶ 61,
75(x); Pl.'s Opp. Summ. J., Paper 104 at 8 n.2.)

ERC's alternative motion to bifurcate at trial the bad faith claim (Paper 92) is also DENIED.  ERC's motion to strike certain evidence (Paper 138) is DENIED to the extent that evidence of industry custom is admissible because the contract is ambiguous; DENIED as to Daubert concerns; DENIED in part and GRANTED in part as to inadmissible legal conclusions; and DENIED without prejudice to renew at time of trial as to sufficiency of the expert testimony.

I.   ERC's Motion for Summary Judgment on the Reinsurance Limit
     (Paper 98)

     A.   Background

     Upon review of the record, and solely for the purpose of this ruling, the Court finds the following.  Plaintiff PCIC is a Vermont corporation that issues professional liability, or "errors and omissions," insurance policies to the actuarial and consulting firms who are PCIC's member/owners.  Five firms formed PCIC in 1987 (hereinafter "member/insureds"); in 1992, PCIC sought to provide excess policies with greater limits, and to reinsure the excess policies to spread the risk.  Today, PCIC purchases reinsurance coverage from various vendors totaling $40 million per member, in five layers of coverage.  Defendant ERC, a Missouri corporation, agreed to provide a certain amount of reinsurance within two of those layers under two reinsurance contracts, referred to as the "1993 Agreement" and the "1997

2

Agreement."  The parties had an effective working relationship
until 2001 when they began to dispute the reinsurance limit and
the dates of specific claims.

The 1993 Agreement provided in relevant part (emphases
added):

### ARTICLE I

APPLICATION OF AGREEMENT.  This agreement applies to
actuarial and professional consultant professional liability
policies issued by the REINSURED as respects claims made on
or after the effective date under policies becoming
effective prior to the termination date of this agreement.

### ARTICLE II

CESSION OF REINSURANCE.  The reinsurance provided by this
agreement shall apply excess of the first $5,000,000 of loss
sustained by the REINSURED with respect to each insured, all
claims. . . .  As respects loss thereafter, the REINSURED
shall retain as its own net retention a 10% quota share part
of the indemnity written and shall cede to the CORPORATION
and the CORPORATION shall accept the remaining 90% share of
the indemnity written but not to exceed $4,500,000 (90% of
$5,000,000) with respect to each insured, all claims.  Such
amount is hereafter called the "reinsurance capacity."

The total amount to be reinsured with the CORPORATION shall
in no case and at no time exceed the reinsurance capacity. .
. .

The REINSURED warrants that all policies subject to this
agreement will be written excess of a $1,000,000 each claim
retention which is self-insured by the insured.

### ARTICLE III

REINSURANCE INDEMNITY.  The CORPORATION hereby agrees to
indemnify the REINSURED against the pro rata share of loss
that the amount so ceded to the CORPORATION bears to the
amount of indemnity written: Provided, that the liability of
the CORPORATION for such loss shall not exceed the
reinsurance capacity.

3

ARTICLE V

(as per Amendment No. 1, effective July 1, 1994)[2]

REINSURANCE PREMIUM.  The REINSURED shall pay to the
CORPORATION an annual reinsurance premium of $1,530,000
payable in two equal installments each in advance of each
July 1st and January 1st.  Prior to each July 1st the
CORPORATION and the REINSURED shall enter into negotiations
with respect to the adjustment needed, if any, to the
reinsurance premium to become effective July 1st.

ARTICLE XII

TERMINATION.  This agreement shall continue in effect until
terminated by mutual consent, or by either party's giving to
the other party not less than 90 days' notice by registered
mail, stating the January 1st which shall be the termination
date.

Additionally, Article VI provided for retrospective premium
adjustment, based on annual accounting periods, two years after
the close of each accounting period.  The Agreement contained no
"following form" or "follow the fortunes" provisions.  (Def.'s
Mot. Summ. J., Paper 98 at 18 n.5, 21 n.7.)

Amendment No. 1 (effective July 1, 1994), in addition to
changing the premium payment schedule, also (1) declared that the
"accounting period which commenced January 1, 1994 shall end on
June 30, 1995," (2) set an additional premium amount of
$364,747.50 for that period, and (3) shifted the annual
accounting period anniversary date from January 1st to July 1st.
(Paper 1 Ex. A.)  These changes acknowledged PCIC's efforts,

---

[2] The original Article V broke down the specific amounts "payable at
each January 1st and . . . each July 1st," and did not provide for
negotiations for premium adjustments.

4

beginning at the time of negotiations with ERC in 1992, to re-align its underlying policies such that all policies and the reinsurance agreement would have the same anniversary date. Amendment No. 2 (effective June 30, 1995) increased the annual reinsurance premium from $1,530,000 to $1,759,500.  (Paper 1 Ex. A.)

In sum, the 1993 Agreement limited ERC's liability to a $4.5 million dollar "reinsurance capacity."  The parties vigorously dispute, however, whether this is an annual, or per policy, limit or a single limit for the life of the agreement.[3]  The Agreement was effective January 1, 1993 until terminated by PCIC on July 1, 1998, because the premiums had become too costly.  ERC seeks partial summary judgment on the reinsurance limit.  (Paper 98.)

B.   Discussion

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

[3]  If the reinsurance limit was annual, then PCIC paid ERC the $1.5 million annual premium for $4.5 million of annual coverage for each of its five member/insureds -- totaling $22.5 million of coverage per year.  If, on the other hand, there was a single reinsurance limit for the life of the Agreement, then PCIC paid ERC the $1.5 million annual premium for $4.5 million of coverage for each of the five member/insureds, for a total of $22.5 million of coverage for the life of the agreement.

PCIC paid ERC premiums for five and one-half years, totaling roughly $7.25 million.  On claims against Towers Perrin, one of the five PCIC member/insureds, ERC paid $4.5 million to PCIC, of which it now seeks reimbursement of $3,095,392.  PCIC claims an additional $1,404,608 under the 1993 Agreement.  The parties do not provide information about how much money ERC has paid to PCIC on total claims from all five PCIC member/insured firms under the 1993 Agreement.

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." <u>See</u>, <u>e.g.</u>, <u>Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.</u>, 432 F.3d 428, 433 (2d Cir. 2005).  The burden is on the moving party to demonstrate there are no material facts genuinely in dispute.  <u>See Feingold v. New York</u>, 366 F.3d 138, 148 (2d Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)).  When ruling on a motion for summary judgment, the court must view the facts and all inferences to be drawn therefrom in the light most favorable to the party opposing the motion. <u>Johnson v. Wright</u>, 412 F.3d 398, 403 (2d Cir. 2005).

    1.   <u>Vermont Contract Interpretation Rules</u>[4]

The question of whether a contract term is ambiguous is a matter of law for the court to decide.  <u>Luneau v. Peerless Ins. Co.</u>, 750 A.2d 1031, 1033-34 (Vt. 2000).  Reinsurance contracts are interpreted according to traditional contract interpretation rules.  1A Couch on Ins. § 9:13 (3rd ed. 2005) (listing general rules, all of which accord with Vermont rules, and citing <u>Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.</u>, 979 F.2d 268, 274 (2d Cir. 1992)).  Among those general rules are the following:  "An insurance policy must be construed according to its terms and the evident intent of the parties as expressed in the policy language . . . [and] [d]isputed terms should be read

---

   [4]   The parties agree Vermont contract law applies.

according to their plain, ordinary, and popular meaning." N. Sec. Ins. Co. v. Perron, 777 A.2d 151, 154 (Vt. 2001) (citations and internal quotations omitted). It is "appropriate, when inquiring into the existence of ambiguity, for a court to consider the circumstances surrounding the making of the agreement," including the "object, nature, and subject matter of the writing." Isbrandtsen v. N. Branch Corp., 556 A.2d 81, 84 (1988) (citations omitted). "Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." Vermont Elec. Power Co. v. Hartford Steam Boiler Inspection & Ins. Co., 72 F. Supp. 2d 441, 444-45 (D. Vt. 1999) (internal quotations omitted); see also Isbrandtsen, 556 A.2d at 85 ("the fact that a dispute has arisen as to proper interpretation does not automatically render the language ambiguous").

If, after considering both the "whole instrument" and "limited extrinsic evidence of circumstances surrounding the making of the agreement," the court finds that the writing is ambiguous, "the proper interpretation becomes a question of fact, to be determined on all relevant evidence." Kipp v. Chips Estate, 732 A.2d 127, 131 (Vt. 1999) (internal quotations omitted); see also Abbiati v. Buttura & Sons, 639 A.2d 988, 991 (Vt. 1994). "[W]hen the meaning of the contract is ambiguous and

the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment." Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir. 2005) (internal quotations omitted) (applying New York law); see also Gardner v. West-Col, Inc., 392 A.2d 383, 386 (Vt. 1978).

An ambiguous provision in a written instrument is construed against the party responsible for drafting it,[5] but an insurer

---

[5]   The parties dispute whether contra proferentum, the canon of construction whereby ambiguous provisions are construed against the drafter, applies to the reinsurance context. No Vermont or Second Circuit case construing Vermont law provides guidance on whether Vermont courts would apply the rule to reinsurance contracts. Therefore, the Court must determine the issue as it believes the Vermont Supreme Court would decide it. Dusharm v. Nationwide Ins. Co., 92 F. Supp. 2d 353, 356 (D. Vt. 2000). Vermont case law and the facts of this case present a close question that the Court resolves against applying the canon.

"It is a general rule of construction in Vermont that a doubtful provision in a written instrument is construed against the party responsible for drafting it." Id. (citing Trustees of Net Realty Holding Trust v. AVCO Fin. Servs., 520 A.2d 981, 983 (Vt. 1986)); see also Peerless Ins. Co. v. Wells, 580 A.2d 485, 487 (Vt. 1990) ("any ambiguity in policy language should be resolved in favor of the insured since the insurer is in a better position to avoid the ambiguity"). But see State v. Glens Falls Ins. Co., 315 A.2d 257, 258 (Vt. 1974) ("This principle cannot be carried to the point of extending the coverage to make the policy something different than contemplated, however.").

Extrapolating from these cases, and in the absence of case law to the contrary, Vermont courts could apply the contra-insurer canon here. See Christiania Gen. Ins. Corp. v. Great Am. Ins. Co., 979 F.2d 268, 278 (2d Cir. 1992) (noting in dicta that "an ambiguous reinsurance contract is generally construed against the reinsurer"). PCIC was new to reinsurance and relatively new to captive insurance when it formed the 1993 Agreement with ERC -- although PCIC did ask consultants from its member/insured firms experienced in reinsurance to negotiate the Agreement (Paper 98 at 5, 7). ERC was allegedly an industry leader that agreed to discuss PCIC's proposal, then drafted the Agreement; and during negotiations, ERC agreed to some but not all of PCIC's comments (Def.'s Resp. St. Undisputed Facts, Paper 130 ¶¶ 48, 59; Pl.'s Resp. St. Undisputed Facts, Paper 107 ¶ 23). These facts favor applying the contra-insurer canon of construction and resolving any ambiguity in favor of PCIC. Courts applying the canon to reinsurance contexts do so because of the unequal relationship; because of the insured's reasonable reliance interests; or because the reinsurer has assumed the liability of the reinsured, which encompasses, if necessary, the resolution of doubt against it. See 1A Couch on Insurance § 9:15 (3rd ed. 2005) (citing Zenith Ins. Co. v. Employers Ins., 141 F.3d 300, 304-05 (7th Cir. 1998) (applying the canon based on established Wisconsin contract rules) and Employers Mut. Liab. Ins. Co., v. Underwriters at Lloyd's, 177 F.2d 249, 252 (7th Cir. 1949)).

There is a stronger case, however, for not applying the canon here and treating the agreement like any other contract because a key policy rationale

"is not to be deprived of unambiguous provisions placed in a policy for its benefit." Peerless Ins. Co. v. Wells, 580 A.2d 485, 487 (Vt. 1990).

    2.   The Plain Language and Circumstances of the 1993 Agreement

The plain language of the 1993 Agreement shows that it is an "excess of loss" agreement, under which ERC will indemnify a "90% share of the indemnity written but not to exceed $4,500,000 (90% of $5,000,000) with respect to each insured, all claims," and that the "[t]he total amount to be reinsured with [ERC] shall in no case and at no time" exceed that amount. The Agreement then repeats that "the liability of [ERC] for such loss shall not exceed the reinsurance capacity," as defined above. The Agreement "shall continue" until terminated, and otherwise specifies no policy period. One might reasonably read the text to mean that ERC's total exposure is $4.5 million for "each insured, all claims" for the life of the Agreement -- the

---

for the canon -- unequal bargaining power -- is absent where the reinsured is a sophisticated party who bargained for the contract language. See Ostrager & Newman, Handbook on Insurance Coverage Disputes §§ 1.03[c], 15.04[a] (stating that courts generally do not refer to the rule in reinsurance cases, and when they do, it appears to be in instances of standard-form or facultative certificate reinsurance contracts). Recent Second Circuit cases applying New York law tend not to apply the canon to disputes involving two insurance companies. See British Int'l Ins. Co. v. Seguros la Republica, S.A., 342 F.3d 78 (2d Cir. 2003) (stating that reinsurance contracts are enforced without resort to contra proferentum) (citing Unigard Sec. Ins. Co. v. N. River Ins. Co., 4 F.3d 1049, 1064-65 (2d Cir. 1993), refusing to resort to contra proferentum in context of a reinsurance notice provision because "reinsurance contracts are negotiated at arm's length by two sophisticated parties," and because "reinsurers are so dependent upon ceding insurers for information, that application of a canon construing the reinsurance contract against the reinsurer would be highly anomalous," citing in turn Great Am. Ins. Co. v. Fireman's Fund Ins. Co., 481 F.2d 948, 954 (2d Cir. 1973)).

implication being that the parties agreed that ERC would take on a limited risk, providing coverage that would decrease the longer the Agreement remained in effect and with each payment ERC made to PCIC.

One may also reasonably read the Agreement to provide an annual, or per policy, limit on ERC's liability.  The Agreement is "continuous" until terminated but contains no anti-annualization language; provides for annual accounting periods; provides for payment of an annual premium of $1,530,000, later increased to $1,759,500; states that ERC has agreed to accept a "90% share of the indemnity written" by PCIC; and does not expressly state areas of nonconcurrency between the Agreement and the underlying "indemnity written."  These provisions together indicate that PCIC is paying an annual premium in exchange for reinsurance on each underlying "indemnity written" -- although "indemnity written" is not defined -- and that the reinsurance limit may "at no time" during each underlying policy's annual[6] period exceed $4.5 million.[7]  This reading avoids the conclusion

---

[6]  The relevant underlying excess policies had annual policy periods. See infra at 20-22.

[7]  ERC argues that a reinsurance contract and its underlying policies are completely separate agreements, with differing obligations.  (Paper 98 at 14.)  It is true that reinsurers have no privity with, and are generally not liable to, the original purchasers of the underlying policy.  See, e.g., Allendale Mut. Ins. Co. v. Crist, 731 F. Supp. 928, 930 (W.D. Mo. 1989).  As to concurrency and nonconcurrency between reinsurance and its underlying insurance policies, however, "[i]n practice, most agreements fall somewhere between the two."  Reinsurance 2, 16 (Robert Strain, ed., 1997).  The degree of concurrency is, in part, what the parties here dispute.

that ERC will receive less and less coverage, for the same annual premiums, the longer the Agreement is in effect.

Because Vermont law allows courts inquiring into contract ambiguity to look at "the circumstances surrounding the making of the agreement," as well as the "object, nature, and subject matter of the writing," Isbrandtsen, 556 A.2d at 84, the Court may turn to such extrinsic evidence.  The following circumstances surrounding the making of the Agreement favor ERC's single-limit interpretation.  First, ERC declined PCIC's initial proposal, which included annual limits; instead, because ERC wanted to enter into a relationship with PCIC on "very conservative terms," it proposed and negotiated the "reinsurance capacity."  (Paper 98 at 6.)  Second, the absence of any "follow" provisions indicates that the parties intended the Agreement to be nonconcurrent with the annualized underlying policies.  Third, ERC proposed the reinsurance limit, and PCIC's negotiator specifically sought to clarify whether the limit applied to each member firm's policy or the total aggregate for all firms -- suggesting that PCIC acknowledged the limit language and did not clarify it with an annual term.  (Paper 98 at 7.)

Other circumstances surrounding the making of the Agreement, however, suggest that PCIC's annualization interpretation is also reasonable.  First, ERC knew from PCIC's initial request and its own due diligence that PCIC sought an annual reinsurance limit

11

for its underlying annual policies.  Second, during initial negotiations, PCIC advised ERC that its member/insureds' policies had different anniversary dates, and that PCIC would eventually need to realign them with each other and the 1993 Agreement to a common date.  Finally, the fact that the nature of the contract is reinsurance suggests that there is some relationship between the reinsurance coverage and the underlying policies.

In conclusion, the plain language of the Agreement, viewed alone and in light of surrounding circumstances, is ambiguous because it supports more than one reasonable interpretation.

       3.   <u>Course of Performance and Industry Practice Evidence</u>

When ambiguity is found, Vermont's contract interpretation rules direct courts to examine all extrinsic evidence.  <u>Abbiati</u>, 639 A.2d at 991 (relevant evidence to be considered after ambiguity is found includes the circumstances under which the policy arose, the history of coverage, and "the way the policy was administered from its inception"); <u>Isbrandtsen</u>, 556 A.2d at 85 (if ambiguity is found, the court may rely on subordinate rules of construction to interpret disputed terms).

PCIC highlights course-of-performance evidence purporting to show that the limit was understood by the parties to be annual, all of which is disputed by ERC:

- PCIC communicated to ERC annual renewals of the Agreement, every year from 1994 to 1997, noting that the reinsurance

provided coverage for underlying policies that had annual limits.  ERC responded to the notices by stating that "formal renewal documentation is not necessary" because the Agreement is continuous.  (Def.'s Resp. St. Undisputed Facts, Paper 130 ¶ 78.)

- Numerous ERC communications, internally and to PCIC, described the Agreement as providing annual aggregate limits.  ERC responds that, in each instance, it was either a mistake made by someone unfamiliar with the Agreement, or a reference to the annual accounting periods or to the underlying annual policies' limits which must be exhausted to trigger ERC's obligations.  (Paper 130 ¶¶ 91-93.)

- ERC's internal loss reserves for PCIC member/insured Towers Perrin's claims show aggregate limits were available per policy year.  ERC responds that this was either a mistake by staff unfamiliar with the Agreement or simply based upon information provided by PCIC.  (Paper 130 ¶¶ 96-98.)

- PCIC paid an annual premium, plus retro-adjusted additional premiums, despite payouts by ERC which would have resulted in lower premiums.  ERC states that PCIC could have ended the relationship if it did not want to pay annual premiums for less and less coverage.  (Paper 130 ¶¶ 81, 103.)

- In 2001, the parties began to dispute whether there was only one policy period for two particular member/insureds for the

13

eighteen-month period of January 1, 1994 to July 1, 1995, or two periods, of six months and twelve months in length, for those policies that PCIC had cancelled and rewritten in order to align them with other policies and with the reinsurance Agreement.  The parties had lengthy discussions over the issue, for which they each seek declaratory judgment; they also amended the Agreement to reflect the re-alignments, see supra at 4-5.  PCIC claims that ERC would not have debated the issue unless ERC knew it was liable for an annual $4.5 million limit for each underlying policy. ERC claims that the realignment process had only to do with the underlying policies' periods, and that "the amendment of the treaty in connection with PCIC policies' anniversary dates related only to 'accounting periods' that relate to retro-premium calculations and do not impact the reinsurance limits."  (Paper 130 ¶¶ 63-69, 82-87.)[8]

Like the circumstances surrounding the making of the Agreement, this course-of-performance evidence neither supports nor refutes annualization of the limit.

ERC initially relied heavily upon the few court decisions that have addressed the issue of annualization of reinsurance

_____

[8]  ERC seeks a declaratory judgment that the 1993 Agreement has a single reinsurance limit.  Should the Court decline to so find, ERC alternatively seeks a declaratory judgment that there is one $4.5 million reinsurance limit for the period January 1, 1994 to June 30, 1995.  (Paper 6 ¶ 75(ii).)  The Court does not reach this issue here.

limits, where the reinsurance policies included "follow" provisions.  See Travelers Cas. and Sur. Co. v. Ace Am. Reins. Co., 392 F. Supp. 2d 659 (S.D.N.Y. 2005); Commercial Union Ins. Co. v. Swiss Reins. Am. Corp., 413 F.3d 121 (1st Cir. 2005); Am. Employers' Ins. Co. v. Swiss Reins. Am. Corp., 413 F.3d 129 (1st Cir. 2005).  The present case is distinguished from these cases because it does not involve "follow" provisions or a fixed policy period.[9]  ERC nevertheless maintains that the reinsurance limit in the 1993 Agreement is precisely the sort of "clear, specific" limit mentioned in Commercial Union, 413 F.3d at 128, that should control, even if PCIC were to establish that the parties intended the Agreement to be concurrent with the underlying policies despite the lack of "follow" clauses.  (Def.'s Supplemental Mem. Supp. Summ. J., Paper 176 at 1, 2-5.)  PCIC responds that the limit language is ambiguous in light of the undefined "indemnity written" term, which PCIC compares to the ambiguous term "occurrence" in First Circuit cases.  (Pl.'s Supplemental Mem. Opp. Summ. J., Paper 177 at 2.)  PCIC also argues that, at best

---

[9]  ERC also suggests that a helpful line of cases is found in direct-side insurance case law, the majority of which rejects annualization glosses, often in consideration of "per occurrence" contracts.  (Paper 98 at 16, n.2; see also Commercial Union, 413 F.3d at 126 (noting that the direct-side insurance cases disfavoring annualization do not implicate "follow" provisions, which "make a difference in our case")).  These direct-side cases, however, are similarly distinguished from the present case because every policy at issue had a pre-determined policy period or termination date, and because they do not implicate the parties' intentions as to concurrency, an issue specific to reinsurance.  See, e.g., Hercules, Inc. v. AIU Ins. Co., 784 A.2d 481, 495-96 (Del. 2001); Soc'y of the Roman Catholic Church v. Interstate Fire & Cas. Co., et al., 26 F.3d 1359, 1366 (5th Cir. 1994); Bd. of Trustees of the Univ. of Ill. v. Ins. Corp. of Ireland, Ltd., 750 F. Supp. 1375 (N.D. Ill. 1990).

for PCIC, "indemnity written" may be interpreted to mean that the parties intended concurrency, and at worst, there is a genuine dispute as to "whether reinsurance agreements by their nature are concurrent to the policies they reinsure (as PCIC contends) or whether there must be an express 'follow-the-form' provision in the reinsurance agreement for concurrency to exist (as ERC contends)."  (Paper 177 at 4-5.)   See N. River Ins. Co. v. Employers Reins. Corp., 197 F. Supp. 2d 972 (S.D. Ohio 2002) (holding that whether the "follow the fortunes" doctrine may be implied in a contract by reason of custom or policy will vary depending on which state's laws apply; denying summary judgment because parties genuinely disputed whether follow-the-settlements clause could be read into a particular reinsurance certificate) (applying New Jersey law).

As addressed below in Section IV, the parties each offer expert testimony regarding the existence of (1) an industry custom or practice whereby any areas of nonconcurrency between reinsurance and underlying policies are expressly stated, and (2) a custom whereby the duty of utmost good faith requires a reinsurer to alert the reinsured to nonconcurrencies and their effect.  Under federal law, the existence of a custom or usage is in the first instance a question of fact.  See Nat'l Am. Ins. Co. v. Certain Underwriters at Lloyd's London, 93 F.3d 529, 537 (9th Cir. 1996) (citing Mentor Ins. Co. v. Brannkasse, 996 F.2d 506,

513 (2d Cir. 1993) (custom or usage is a question of fact)).  If a custom is shown to exist, then the custom may become a part of the contract if state law permits it.  Id.  Under Vermont law, industry custom must be proved by evidence that (1) the custom existed and prevailed in the relevant market at the time the contract was made, and (2) the parties in fact contracted with knowledge of the custom, or the custom is so general and notorious that knowledge may be presumed.  Russell's Executrix v. Ferguson, 60 A. 802 (Vt. 1905).  When both parties are engaged in the industry, it is presumed they have knowledge of the customs of that industry.  Lambourne v. Manchester Country Prop., 374 A.2d 122, 124 (Vt. 1977).  The burden is on the party asserting the custom.  Killington, Ltd. v. Richards, 641 A.2d 340, 341 (Vt. 1993); see also British Int'l Ins. Co. v. Seguros La Republica, S.A., 342 F.3d 78, 83-84 (2d Cir. 2003); William Hoffman, On the Use and Abuse of Custom and Usage in Reinsurance Contracts, 33 Tort & Ins. L.J. 1, 24-25 (1997) (Hoffman is ERC's expert witness).

Applying these rules and viewing all facts in favor of nonmovant PCIC, the Court finds that PCIC has presented evidence that there are genuine issues of material fact in dispute, including what the parties intended for the effect of the reinsurance limit; whether the parties intended the "indemnity written" term to subject the reinsurer's liability to the terms

17

of the underlying excess policy, akin to a "following form" clause; and whether the customs and practices alleged by PCIC exist, whether the parties in fact contracted with knowledge of the customs, whether the customs are so general and notorious as to be presumed, and whether both parties may be considered engaged in the reinsurance industry such that they were aware of the customs.  Because PCIC has demonstrated that there are material facts genuinely in dispute, ERC's partial summary judgment motion on the reinsurance limit is DENIED.

        4.   <u>Waiver and Estoppel</u>

PCIC argues that ERC waived its single-limit argument by "continually act[ing] as if the 1993 Agreement has per policy, or annual, aggregate limits" -- specifically, by collecting annual premiums.  (Pl.'s Resp. Opp. Summ. J., Paper 106 at 19.)  As this Court noted in <u>City of Burlington v. Hartford Steam Boiler Inspection and Ins. Co.</u>, 190 F. Supp. 2d 663, 679 (D. Vt. 2002), <u>aff'd</u> 346 F.3d 70 (2d Cir. 2003), "[w]aiver has sometimes been viewed as an issue of fact for the jury, particularly where acts and conduct are relied upon as the basis for a finding of waiver. Where the evidence of waiver is undisputed, however, the issue is one for the court."  Because it is hotly contested whether ERC acted in a manner inconsistent with an intent to dispute annual limits and waited until September 2002 to make such an assertion, the issue is not ripe for summary judgment.

PCIC also claims that ERC should be estopped from raising the single-limit argument.  The party asserting estoppel must prove the following four elements:  that the party to be estopped must know the facts, it must intend or know that its conduct shall be acted on by the party asserting estoppel, the latter must be ignorant of the true facts, and it must rely on the former's conduct to his injury.  Beecher v. Stratton Corp., 743 A.2d 1093, 1096 (Vt. 1999).  "It is an essential element in estoppel that the party claiming it was induced to act or refrain from acting by it and thus relying and induced did take some action."  City of Burlington, 190 F. Supp. 2d at 680 n.14 (citing Farm Bureau Mut. Auto. Ins. Co. v. Houle, 118 Vt. 154, 102 A.2d 326, 330 (1954)).

Prejudice is an issue of fact, and PCIC has made a preliminary showing that it was induced by ERC's conduct into relying on the 1993 Agreement as having annual limits and therefore failing to "purchase reinsurance from other markets when it could have done so," and that this omission resulted in a cognizable harm.  (Paper 106 at 21.)  PCIC has not proved, however, that ERC had superior knowledge of the facts. Therefore, estoppel is not appropriate here.

II.  ERC's Motion for Summary Judgment on Dates of Claim
     (Paper 95)

PCIC claims ERC is obliged to pay $1,404,608 under the 1993 Agreement and $5 million under the 1997 Agreement for two

underlying claims brought against member/insured Towers Perrin, allegedly during the 1997-98 policy year.  ERC disagrees, and moreover, seeks reimbursement from PCIC of the $3,095,392 ERC has already paid under the 1993 Agreement on the two claims because PCIC allegedly assigned to them improper dates of claim.  The questions presented are (1) whether PCIC properly assigned dates of claim to the two claims on the basis of provisions in the primary policy, and if yes, then (2) whether ERC must indemnify PCIC for those claims, pursuant to the 1993 and 1997 Agreements which reinsure PCIC's excess policies.

A.   Background

1.   The Primary, Excess, and Reinsurance Policies

There are three tiers of insurance at issue in this case. Relevant here are the terms and conditions of each policy and the degree to which the tiers provide the same or varying coverage.

The bottom tier of insurance coverage was PCIC's three-year, claims-made[10] primary policy to its member/insured Towers Perrin for July 1, 1997 to July 1, 2000, Policy Number PO 197. (Affidavit of Stephen T. Jacobs, Supp. Opp. Summ. J., Paper 116

---

[10] "The purpose of claims-made policies, unlike occurrence policies, is to provide exact notice periods that limit liability to a fixed period of time 'after which an insurer knows it is no longer liable under the policy, and for this reason such reporting requirements are strictly construed.'" Nat'l Union Fire Ins. Co. v. Willis, 296 F.3d 336, 343 (5th Cir. 2002).  "'Claims-made' policies permit the reporting of acts not yet in litigation.  This provides additional protection for the insured, because coverage could extend to a suit not brought until long after the policy has expired, as long as the insured provides notice to the insured [sic] of potential claims."  Id. (citing FDIC v. St. Paul Fire & Marine Ins. Co., 993 F.2d 155, 158 (6th Cir. 1993)).  See also Ostrager & Newman § 4.02[b] (10th ed. 2000).

Ex. H.)  The policy was divided into three policy years, each
starting July 1st and each with a $5 million limit per policy
year, excess of the $1 million self-insured retention ("SIR") to
be paid by Towers Perrin.

Three claims provisions in the primary policy are relevant
here.  Clause IV.1.(a) of the primary policy, entitled "Claims,"
provided that, "[f]or the purposes of this Policy, the date upon
which such claim is made against the assured firm is the date on
which such claim attaches to the Policy."  The next clause,
Clause IV.1.(b) provided a notice-of-circumstance provision
(emphases added):

> If prior to the expiry date of this Policy . . . (ii) the
> assured firm shall become aware of <u>any circumstances</u> which
> may subsequently give rise to a claim being made . . . and
> if the assured firm shall . . . no later than 30 days after
> the expiry date of this Policy give written <u>notice</u> to the
> Company of the receipt of such written notice . . .  of such
> circumstance . . . then any claim which may subsequently
> arise therefrom shall for the purpose of this Policy be
> <u>treated as a claim made on the date on which such notice was</u>
> <u>given</u> to the Company or the last day of the Policy period,
> whichever is earlier.

In the section entitled "Limit," Clause IV.2.(b) added that
"[a]ll claims <u>arising out of the same act or related acts</u> of the
assured firm shall be considered a single claim and only one sum
insured is applicable to the total amount of such claim, even if
such claims occur in different policy years."

At the second tier were five layers of excess insurance PCIC
issued to Towers Perrin, which were effective in 1997, and
renewed in 1998 and 1999.  The second-layer excess policy, Policy

Number POXS 197, had a limit of $5 million annual aggregate, excess of the underlying policy's $5 million annual aggregate, excess of the $1 million SIR each claim.  (Paper 116 Ex. I.)  The fifth-layer excess policy, Policy Number PO4THXS 197, had a limit of $10 million annual aggregate, excess of underlying policy $30 million annual aggregate, excess of a $1 million SIR each claim. (Paper 116 Ex. J.)

Each excess policy stated that "[t]his is a 'Claims Made Policy' and applies only to claims first made against the Assured during the Policy Period."  In Clause V, "Incorporation of Primary Terms," the policies stated that they incorporated the same terms and conditions as the primary policy, except as regards the policy period, limit of liability, premium, and certain other provisions.  Clause IX provided that "notice of claims, or circumstances which may give rise to a claim hereunder, given to the Primary Insurer in accordance with the terms of the Primary Policy shall be given simultaneously to the Company hereon."  Finally, the excess policies contained a discovery provision (emphasis added):

> If the Company shall cancel or refuse to renew this Policy
> for any reason other than non-payment of premium the assured
> firm shall then have the right, upon payment of an
> additional premium of 75% of the Deposit Premium stated in
> the Declarations, to an extension of the cover granted by
> this Policy in respect of <u>any claim or claims made against
> the Assured during the period of 12 months after the date of
> termination (or arising out of a circumstance notified to
> the Primary Insurer during such period)</u> but only in respect
> of acts committed before the date of termination.  Such
> rights hereunder must, however, be exercised by the Assured
> by notice in writing not later than ten (10) days after the

date referred to in the preceding sentence.  If such notice
is not given, the Assured shall not at a later date be able
to exercise such right.  The extension of cover under this
clause shall not increase the Limit of Liability as stated
in the Declarations.

At the top tier of coverage, ERC reinsured under the 1993
Agreement the second-layer excess policy issued by PCIC to Towers
Perrin for the July 1, 1997 to July 1, 1998 policy year, Policy
Number POXS 197.  As discussed in Section I, under this agreement
ERC would reimburse PCIC $4.5 million (ninety percent of the $5
million layer) per insured (per claim and in the aggregate) for
losses sustained under each "indemnity written" to its insured,
excess of the $5 million per insured (per claim and in the
aggregate) paid by PCIC and excess of the $1 million SIR on each
claim paid by each insured.  The 1993 Agreement was effective
from January 1, 1993 to July 1, 1998.

The 1993 Agreement did not define what constituted a claim
or when a claim was deemed made.  It provided, in relevant part:

> CLAIMS.  [PCIC] agrees that it will investigate and will
> settle or defend all claims arising under policies with
> respect to which reinsurance is afforded by this agreement,
> and that it will give prompt notice to [ERC] of any claim in
> excess of [PCIC's] applicable retention and prompt notice of
> any other event or development which would involve [ERC]
> hereunder, and will forward promptly to [ERC] copies of such
> pleadings and reports of investigation as may be requested
> by [ERC].
>
> [ERC] may, at its own expense, participate with [PCIC] in the
> investigation, adjustment or defense of claims to which, in the
> judgment of [ERC], it is or might become exposed.

In a letter dated January 14, 1993, however, ERC's Claims
Counsel informed PCIC of the "reporting criteria for any claims,"
"actual or potential," arising during the reinsurance coverage.

The letter stated that for each claim reported, the initial report to ERC should first include "[t]he date of loss -- the date in which the actual or potential claim was made against the insured (PCIC's member firm), or the date the circumstance was first reported to PCIC's [sic] by the member firm." (Paper 116 Ex. K.)  In accordance with ERC's reporting criteria, PCIC regularly submitted quarterly claims summaries to ERC, as well as updates on claim developments as needed.  The parties dispute, however, the significance of the reporting criteria to the determination of when a claim is deemed made under the 1993 Agreement.  (Def.'s Resp. St. Undisputed Facts, Paper 145 ¶¶ 109, 110.)

Finally, ERC reinsured under the 1997 Agreement the fifth-layer excess policy issued by PCIC to Towers Perrin for the July 1, 1997 to July 1, 1998 policy period, Policy Number PO4THXS 197. (Paper 116 Ex. G.)  The 1997 Agreement was effective July 1, 1997 to July 1, 1998.  Pursuant to this agreement, ERC would reimburse PCIC fifty percent of the $10 million layer, or $5 million (per claim and in the aggregate), excess of the primary and underlying excess limits of $30 million per insured (per claim and in the aggregate).  The 1997 Agreement stated that the certificate applied "as respects claims first made against the insured during the certificate period."  The 1997 Agreement's "Claims" clause stated that the reinsured "will give prompt notice to the Corporation of any occurrence, event, or development, including

24

any change in the Reinsured's applicable loss reserves, which, in the judgment of the Reinsured, might result in a claim for indemnity hereunder."  Neither the 1993 nor the 1997 Agreement contained "follow form" or "follow the settlements" clauses.

### 2.   Circumstances of the LACERA Claim

Towers Perrin conducted certain pension work for the Los Angeles County Employees Retirement Association (LACERA).  On May 6, 1998, Towers Perrin wrote a notice-of-circumstances letter to PCIC stating:  "Please see the enclosed March 9, 1998 article from Pensions and Investments [entitled "LACERA Shock – Audit uncovers $1.2 billion liability"].  With respect to this current situation, this letter is to provide formal notice of a potential claim.  Please note that no claim has yet been asserted."[11] (Paper 116 Ex. L.)

PCIC assigned May 6, 1998 as the date of claim pursuant to the "notice of circumstances" provision in the primary policy, and reported that date to ERC "pursuant to the terms of PCIC's policies and with Tower Perrin's 'formal notice of a potential claim,'" referring to ERC's reporting criteria for date of loss set out in the January 14, 1993 letter.  (Paper 109 ¶ 27; Paper 116 ¶ 19.)  PCIC first reported the claim to ERC in the May 29,

---

[11]  In the attached article, a LACERA representative "declined to say whether LACERA officials were contemplating action against Towers Perrin," and another "declined to comment on whether Towers Perrin should compensate the pension fund for the computer errors," stating that "he won't comment until all information concerning the errors is known."  The article also noted that "a LACERA trustee, said he plans to push for discussion 'of anything we can do' against Towers Perrin."  (Paper 116 Ex. L.)

1998 quarterly claims summary, describing it as a "Potential Claim of" LACERA and indicating "Date of Claim: 05/06/98 (notice)." (Paper 116 ¶ 21.) PCIC also noted at that time that while "[n]o claim has been made to date," "there seems a reasonable possibility that a claim will be advanced," and that the "$2,500,000 total reserve acknowledges that if a claim is brought, it will in all likelihood be a very significant claim." (Paper 145 ¶ 112.)

On November 15, 1999, Towers Perrin and LACERA entered into a tolling agreement to preserve any claims LACERA might bring. On January 12, 2001, however, LACERA filed a complaint for professional negligence, breach of written contract, and breach of implied contract against Towers Perrin in Superior Court of California, seeking damages of $2 billion and alleging significant computer errors in its pension work. On March 20, 2003, Towers Perrin and LACERA settled the suit for a confidential amount.

From 1999 through 2003, PCIC reported to ERC developments in the LACERA matter. Until the claims summary report dated December 21, 1999, in which PCIC notified ERC of the tolling agreement, PCIC continued to assert that "no claim has been made." (Paper 145 ¶ 114.) As of the March 2000 claims summary, PCIC dropped that phrase and thereafter provided ERC with updates

on the claim, including damage assessments and settlement
talks.[12]  (Paper 145 ¶ 116.)

In March 2003, PCIC notified ERC of the tentative settlement
between Towers Perrin and LACERA, then submitted a formal proof
of loss for the entire amount of reinsurance available under the
1993 and 1997 Agreements for the 1997-98 policy year.  (Paper 145
¶¶ 122, 123.)  In a letter dated April 4, 2003, an ERC claims
specialist requested additional information from PCIC regarding
the claim, including an explanation as to how PCIC assigned the
date of claim.  (Paper 116 Ex. GGG.)[13]  Then in Summer 2003, ERC

---

[12]  ERC disputes, however, whether PCIC gave ERC all the information
that it had given to other reinsurers, and whether PCIC gave ERC all the
information that PCIC was required to supply under the 1993 Agreement and the
duty of utmost good faith.  (Paper 145 ¶¶ 113-16.)  ERC cites for support a
gap in PCIC's reporting to ERC in 2001 and 2002.  (Paper 145 ¶ 116.)

[13]  The text of the April 4, 2003 letter from ERC to PCIC counsel is as
follows:
> This will acknowledge receipt of the reinsurance proof of
> loss in connection with the $10 million excess of $30
> million layer for the July 1, 1997 to June 30, 1998 policy
> period.  In order to further evaluate the request for
> reimbursement, we would appreciate the following
> information:
>> 1.  A copy of the reinsured policy and copies of the
>> underlying policies;
>> 2.  A copy of the underlying complaints in the
>> Hughes/Raytheon and LACERA claims;
>> 3.  An explanation of how the date of loss for both of
>> these claims was determined;
>> 4.  An explanation as to how the expense payments were
>> allocated to the various layers of insurance allegedly
>> impacted by these claims, and
>> 5.  Copies of the settlement agreements and
>> documentation of the expenses incurred for both of
>> these claims.
> We look forward to receiving the requested information.  In
> the meantime, please note that ERC's investigation of this
> request is subject to a complete reservation of rights and
> defenses.

hired outside counsel to conduct an audit of the PCIC claims files, with which PCIC cooperated.  (Paper 145 ¶¶ 125-26.)

ERC's independent audit occurred in July 2003, and before learning the outcome, PCIC filed this suit in August 2003.  In a letter dated October 9, 2003, ERC's independent auditor notified PCIC that "it is ERC's position that PCIC assigned improper dates of loss to the LACERA and 'Hughes/Raytheon' claims [discussed below]."[14]  (Paper 145 ¶ 128.)  ERC now alleges that PCIC assigned the wrong date of claim to the LACERA claim and that the correct date of claim is November 15, 1999, which falls outside the reinsurance coverage; therefore, ERC owes no further indemnity under either Agreement.

### 3.   Circumstances of the Hughes/Raytheon Claim

In 1987, Hughes Electronics Corporation ("Hughes") hired Towers Perrin to provide consulting services for its pension plans.  In mid-1995, Hughes began to out-source certain benefits administration functions to Hewitt Associates ("Hewitt").  In January 1996, Hewitt advised Hughes that, in its view, Hughes' method of calculating retirement benefits for highly-compensated employees did not comply with Section 415 of the Internal Revenue Code.  (Paper 109 ¶¶ 43-45.)

---

[14]  ERC's auditor -- Bruce Engel, an attorney in the present case -- also notified PCIC at that time of "ERC's position that only a single $4,500,000 limit per insured is available to PCIC for the entire ERC treaty period (January 1, 1993 to July 1, 1998)."  (Paper 116 ¶ 53(b).)

In January 1997, Hughes entered into a merger agreement with Raytheon Corporation through which Raytheon acquired Hughes' defense-related assets and thereby assumed the obligation to pay pension benefits to certain retirees from the defense business. During the due diligence period by Raytheon, Hughes re-visited the Section 415 issue and in August 1997, filed a Voluntary Compliance Resolution with the Internal Revenue Service, disclosing a possible "operational defect" in the method Hughes used to calculate certain Section 415 limits.  Hughes did not advise Raytheon of the Section 415 issue until after the merger closed on December 17, 1997.  (Paper 109 ¶¶ 47-51.)

In 1998, retirees affected by the Section 415 issue threatened legal action against Hughes, and in response, both Hughes and Raytheon agreed to a voluntary settlement program to pay retirees what they originally would have received prior to recalculating the Section 415 payments.  Hughes believed that Towers Perrin was responsible for the miscalculation of the Section 415 payments and increased pension liabilities, and demanded that Towers Perrin fund the program. Towers Perrin refused, but offered to make contributions to offset the tax consequences for the retirees, which Hughes rejected.

On March 6, 1998, however, Towers Perrin and Hughes entered into a tolling agreement to preserve any claims by Hughes against Towers Perrin regarding the Section 415 issue.  Although Raytheon was not a party or signatory to the tolling agreement, the

29

agreement mentioned Raytheon as "the transferee of Hughes defense business."  The tolling agreement provided in relevant part:

> WHEREAS, Hughes and Towers Perrin have been negotiating and are prepared to continue to negotiate to resolve all claims that Hughes, its affiliate and/or Raytheon Company ("Raytheon"), as transferee of Hughes' defense business, may have against Towers Perrin arising out of or relating to the Pension Plan issues;
>
> WHEREAS, Hughes seeks to preserve any potential claims it, its affiliates, and Raytheon may have against Towers Perrin arising out of or relating to the Pension Plan issues; . . .
>
> IT IS HEREBY AGREED THAT:
> 1.  The running of the statute of limitations, repose or periods of prescription applicable to any causes of action or claims that Hughes, its affiliates and/or Raytheon have or may  assert against Towers Perrin arising out of or relating to the Pension Plan issues, shall be interrupted, suspended and deemed to have been tolled as of March 6, 1998 . . . .

Towers Perrin notified PCIC of the Section 415 issue and March 6, 1998 tolling agreement, and as a result, PCIC assigned March 6, 1998 as the date of claim for the Hughes claim.  PCIC first notified ERC of the Hughes claim, including the date of claim assigned, in a quarterly claims summary dated May 29, 1998;[15] at this time, however, PCIC did not mention any claim by Raytheon against Towers Perrin.

All three parties -- Towers Perrin, Hughes, and Raytheon -- attempted mediation, but litigation ensued.  On November 16, 1999, Hughes filed a lawsuit against Towers Perrin in California state court asserting claims for professional negligence, breach of fiduciary duty, and declaratory judgment, primarily based upon

---

[15]  This is the same May 29, 1998 claims summary report that notified ERC about the "potential" claim from LACERA.  (Paper 145 ¶ 131.)

the allegedly faulty Section 415 calculations.  On January 16, 2001, Towers Perrin and Hughes reached a confidential settlement.

On November 17, 1999, Raytheon filed suit against Towers Perrin in Massachusetts federal court asserting claims for actual fraud, constructive fraud, negligent misrepresentation, deceptive trade practices, and professional negligence.  (Paper 109 ¶ 66.)  The first four counts alleged that Towers Perrin used unreasonable assumptions in valuing estimated liabilities of certain Hughes pension plans and misrepresented the estimated value of surplus in the Hughes' plan; as a result, Raytheon claimed that it "paid more than it otherwise would have" for Hughes's defense-related business.  (Paper 109 ¶¶ 69, 71; Affidavit of Julia Holt, Supp. Opp. Summ. J., Paper 115 Ex. A, 570.)  The fifth, professional negligence count directly referenced the Section 415 issue and claimed that the result of Towers Perrin's conduct was that Raytheon "incurred substantial costs in developing a settlement approach and making payments to affected . . .  retirees."  (Paper 109 ¶¶ 68-70.)

In a letter dated November 22, 1999, Towers Perrin notified PCIC of the Hughes lawsuit, noting that "[t]his is related to the claim we previously notified you about," referring to the earlier notification of the Hughes-Towers Perrin tolling agreement.  (Paper 116 Ex. CC.)  Then, in a letter dated December 7, 1999, Towers Perrin notified PCIC of the Raytheon lawsuit, again noting that "[t]his is related to the claim we previously notified you

about," presumably referring to the Hughes claim.  (Paper 116 ¶¶ 26-27, Ex. CC.)

In a December 13, 1999 letter sent to another reinsurer and copied to ERC, PCIC stated that it had assigned the date March 6, 1998 -- the date of the Hughes/Towers Perrin tolling agreement -- to both the Hughes and Raytheon claims, for the following reason: "As both claims arise out of the same act or related acts, they are considered a single claim for both self-insured retention and policy limit purposes under Section IV.2.(b) and (c) of the PCIC policy."  (Paper 109 ¶ 39-41; Paper 116 Ex H.)  PCIC also based this decision on the fact that Towers Perrin had referenced the Hughes claim when it notified PCIC of the Raytheon lawsuit. Thereafter, PCIC notified ERC of the Hughes and Raytheon claims developments, beginning with the December 27, 1999 claims summary, prompting ERC claims specialists to make internal notes on the claim and set reserves based upon those reports.  (Paper 109 ¶¶ 143-45.)

PCIC's March 6, 1998 date-of-claim assignment proved contentious first with Towers Perrin and later with ERC.  In a July 30, 2001 letter, Towers Perrin requested that PCIC (1) separate the Hughes and Raytheon actions, (2) amend the Raytheon action to reflect a date of claim of November 17, 1999, "the date upon which Towers Perrin first learned of the pension valuation claims," and (3) provide coverage for the Raytheon action under PCIC's policy period July 1, 1999 to July 1, 2000.  (Paper 109 ¶

42.)  Towers Perrin also asked that if PCIC did not agree outright, that PCIC commission an independent review of the matter before making a final determination.  (Paper 109 ¶ 74.) PCIC commissioned such a review by retained counsel, Robert Cusumano.  (Paper 109 ¶¶ 74, 75.)

During the independent review, Towers Perrin's outside counsel, Kirk Pasich, argued that the Hughes and Raytheon claims were separate claims with different dates of claim because they involved different personnel and time periods in 1987-88 and 1996 respectively.[16]  (Paper 109 ¶¶ 76-80.)  Mr. Pasich also argued that the Hughes claim only involved Section 415 issues, which were the only issues addressed in the Hughes-Towers Perrin tolling agreement, as well as the mediation between Towers Perrin, Hughes, and Raytheon;[17] in contrast, the Raytheon claim involved different pension valuation claims and damages.  (Paper 109 ¶ 81.)

Ultimately, however, upon advice of the independent counsel, PCIC denied Towers Perrin's request to separate the Hughes and Raytheon claims.  ERC complains that it received only minimal

---

[16]  Mr. Pasich represents PCIC in the present matter, arguing the opposite.

[17]  The claims under discussion in the settlement meetings, pursuant to a definition in the tolling agreement, included:  "the administration and operation of certain pension plans, the calculation of contributions to and benefits payable from such pension plans (including the calculation of the maximum benefits permissible under Section 415 of the Internal Revenue Code of 1986, and amended), and the calculation of Hughes' liabilities to and under such pension plans (collectively, the 'Pension Plan Issues')."  (Paper 109 ¶ 61.)

information about PCIC's assignment decision and its denial of Towers Perrin's July 31, 2001 request to separate the claims, and received that information only later, in the October 2001 and January 2002 claims summary reports.  (Paper 145 ¶¶ 116, 151, 163.)

On September 27, 2002, Towers Perrin and Raytheon settled the Raytheon action, and on October 7, 2002, PCIC submitted a formal proof of loss to ERC for indemnity of the Raytheon settlement.  As quoted above at page 27, in April 2003, ERC asked PCIC for information about the LACERA and Hughes/Raytheon claims, specifically how the date of claim was assigned, and then undertook an independent audit of PCIC's claims.  (Paper 145 ¶ 165.)  In an October 9, 2003 letter, ERC's independent auditor notified PCIC that "it is ERC's position that PCIC assigned improper dates of loss to the LACERA and 'Hughes/Raytheon' claims."  (Paper 145 ¶ 128.)  The present litigation between PCIC and ERC followed.

B.   <u>Waiver and Estoppel</u>

PCIC argues that ERC has waived, or is estoped from raising, its challenges to the dates of claim.

1.   <u>Waiver</u>

The purpose of the waiver doctrine is to relieve against forfeiture.  <u>Beatty v. Employers' Liab. Assurance Corp.</u>, 168 A. 919, 922 (Vt. 1933).  This Court set out the relevant rules in <u>City of Burlington</u>, 190 F. Supp. 2d at 680:

> According to well-established Vermont law, [a] waiver is the
> voluntary relinquishment of a known right.  To establish it,
> there must be shown an act or omission on the part of the
> one charged with the waiver fairly evidencing an intention
> permanently to surrender the right in question.  It may be
> express or implied.  But, if it is of the latter class,
> caution must be exercised in proof and application.  The
> facts and circumstances relied upon must be unequivocal in
> character.  Silence, alone, is never a waiver.  It is only
> where there is an obligation to speak that it has that
> result.

(citations omitted).  The burden of establishing a waiver is upon
the party asserting it.  Id. (citation omitted).  As noted above,
in Section I, "[w]aiver has sometimes been viewed as an issue of
fact for the jury, particularly where acts and conduct are relied
upon as the basis for a finding of waiver."  Id. at 679.

Accepting PCIC's version of the facts of this case, ERC
waited five years before it challenged the assigned dates of
claim.  Viewing the facts more conservatively, ERC waited over
three years to question the LACERA date of claim and over a year
to question the Raytheon date of claim.  As of the March 2000
claims summary, ERC knew that PCIC was treating the LACERA claim
as an actual, rather than potential, claim and as of the January
2002 claim summary -- when PCIC informed ERC that it had rejected
Towers Perrin's request to separate the Hughes and Raytheon
claims -- ERC knew that PCIC would continue to treat the Raytheon
claim as a single claim with the Hughes claim.  Not until April
2003 did ERC ask for more information.

PCIC looks to Vermont law for support, where Vermont courts
have applied the waiver doctrine to bar insurers from stating a

defense to coverage.  Mears v. Farmers Coop. Fire Ins. Co., 28
A.2d 699, 701 (Vt. 1942) (stating the rule that "when an insurer
with full knowledge elects not to take advantage of a forfeiture,
he waives it, and cannot assert it in defense, though the insured
was not misled to his prejudice.  Such a waiver may be express or
implied, before or after the forfeiture.").  In Mears, an insurer
collected an assessment on a fire insurance policy but then
claimed that the policy was void because the land on which the
insured building was built was not owned by the insured; the
court found that these contradictory positions were evidence from
which a jury could find a waiver.  Id. at 700-01.  PCIC claims
ERC likewise has taken contradictory positions which evidence a
waiver.  ERC set reserves based on claims it now asserts are not
covered, made some payments on the now disputed claims, and
charged PCIC additional premiums for the 1997-98 based on its
internal reserves for the now-disputed claims.  (Pl.'s Resp. Opp.
Summ. J., Paper 108 at 3.)   ERC notes, however, that it set its
reserves based upon PCIC's claims report.  Also, although ERC
admits that it was simply inattentive to PCIC's reports until
April 2003 (Paper 145 ¶ 144), a party cannot be found to have
waived its defense because it made a mistake, Mears, 28 A.2d at
701, and "mere general carelessness" on the party claimed to be
estopped is usually not a sufficient basis on which to apply the
doctrine, Aetna Ins. Co. v. Glens Falls Ins. Co., 453 F.2d 687,
691 (5th Cir. 1972).  Moreover, when ERC did ask for more

information, its April 2003 letter stated a reservation of "rights and defenses." See supra at 27, n.15. Therefore, ERC did not waive its right to challenge the dates of claim at issue.

       2.   Estoppel

Because PCIC has not proved at least two elements of estoppel, the doctrine is not appropriate here. See supra at 18-19 (stating the elements of estoppel). PCIC has not proved that ERC knew the facts, or that PCIC was ignorant of the true facts. Moreover, PCIC only suggests, but does not prove, that it relied on ERC's apparent acceptance of the dates of claim by "not placing reinsurers for later policy years on notice of the claims." (Paper 145 ¶ 172, citing affidavit of PCIC's counsel stating that he would have advised PCIC to purchase other reinsurance with annual limits if he had known that ERC would not pay additional indemnity.) See Sphere Drake Ins., Ltd. v. All Am. Life Ins. Co., 300 F. Supp. 2d 606 (N.D. Ill. 2003), aff'd 376 F.3d 664 (7th Cir. 2004) (finding no estoppel or waiver where party asserting them could not prove the purported detrimental reliance of paying additional premiums or seeking alternative cover; there was insufficient evidence that the party could have obtained alternative cover). In conclusion, ERC should not be estopped from challenging the dates of claim here. The Court therefore proceeds to the merits of ERC's motion.

C.   Relevant Rules

The basic canons of construction for interpreting contracts, outlined above in Section I.B.1., apply here.  Additionally, under Vermont law, there can be no "claim" under a claims-made policy until there is first a "specific demand for relief." Windham Solid Waste Mgmt. Dist. v. Nat'l Cas. Co., 146 F.3d 131, 133-34 (2d Cir. 1998) (holding that, although the Vermont Supreme Court had not yet defined the term "claim," the "plain and ordinary meaning of 'claim' is a demand for specific relief owed because of alleged wrongdoing.").  The Windham court also noted the subtleties of a claim:

> A claim may be something other than a formal lawsuit, especially where, as here, the insurance policy treats "claims" and "suits" as separate terms. . . . However, an accusation that wrongdoing occurred is not by itself a claim, . . . nor is a naked threat of a future lawsuit, . . . or a request for information or an explanation. . . .  A claim requires, in short, a specific demand for relief.

Id. (citations omitted).  A claim "can be some demand well short of a formal enforcement proceeding," indicating that it is the intention of the party to hold the other responsible.  Id. at 135.  But a "threat of a claim" is the "situation where a third party, not yet damaged, tells the insured merely that it would be held liable for any possible future damages flowing from the insured's wrongful act."  Id. at 135 (quotations and citation omitted).

As for reinsurance contracts, in order for a reinsurer to be liable to its cedent, the loss must have resulted from a risk

that was covered by both the underlying policy and the contract
of reinsurance.  Christiania Gen. Ins., 979 F.2d at 280.
However, a "reinsurer cannot second guess the good faith
liability determinations made by its reinsured."  Id.; see also
Reinsurance 24 (Strain, ed. 1997) (describing the duty of utmost
good faith as fundamental to the reinsurance relationship, under
which the reinsured is obliged to give timely notice of every
claim subject to the reinsurance and the reinsurer is obliged to
keep the reinsured informed of its intentions and practices).

    D.   Discussion

        1.  The LACERA Date of Claim

     The specific issues here are (1) whether the PCIC primary
policy's notice-of-circumstances provision is unambiguous and
works to bring the LACERA claim within the 1997-98 policy year,
where Towers Perrin gave notice of the potential claim on May 6,
1998 and where the claim was made November 15, 1999, after the
policy year ended on June 30, 1998 but before the policy expired
in 2000; and if yes, then (2) whether ERC must indemnify the
claim, under the 1993 and/or 1997 Agreements which reinsured
PCIC's excess policies.

     PCIC's notice-of-circumstances provision in Clause IV.1.(b)
of the primary policy, quoted above at page 21, is a variation on
similar "circumstances" provisions which have been upheld as
expanding coverage to potential claims for which notice was
provided during the policy period.  See Ostrager & Newman §

39

4.02[b] at 116-17.  Such a provision commonly reads, "If during
the Policy Period . . . the Insured shall become aware of any
circumstances which may reasonably be expected to give rise to a
Claim . . . then any Claim which is subsequently made against the
Insureds and reported to Insurer . . . shall be considered made
at the time such notice of circumstances was given."  <u>See</u>, <u>e.g.</u>,
<u>Nat'l Union Fire Ins. Co. v. Willis</u>, 139 F. Supp. 2d 827, 830-31
(S.D. Tex. 2001), <u>aff'd</u> 296 F.3d 336 (5th Cir. 2002); <u>see</u> <u>also</u>
<u>Harbor Ins. Co. v. Cont'l Bank Corp.</u>, 922 F.2d 357, 369 (7th Cir.
1990) (discussing a notice-of-occurrence provision which provided
"if that notice is given within the policy period (<u>i.e., before</u>
<u>expiration of the policy</u>), then the claim, even though filed
later, will be considered to have been made within the policy
period.") (emphasis added).  The similarity of PCIC's provision
to those found in other cases involving professional liability
insurance suggests that PCIC intended this type of coverage-
expansion, despite its awkward "[i]f prior to the expiry of this
Policy" phrasing.

     Significantly, the PCIC provision stated that if notice to
the insurer is given pursuant to Clause IV.1.(b) and a claim is
subsequently made, the claim shall be deemed made "on the date on
which such notice was given," and therefore, could be applied to
claims made during the policy period to deem them made earlier in
the period.  ERC argues that the provision only applies when the
actual claim is made after the policy has expired -- which was

not the case here, where notice of the potential LACERA claim was given within the 1997-98 policy year and the claim came during the 1999-2000 policy year.  The plain language, however, shows that PCIC's primary policy will cover all claims where the insured firm gives notice of the "circumstances" of a potential claim during the policy, or "no later than 30 days after the expiry date;" if the insured meets this requirement, then "any claim which may subsequently arise therefrom" will be "treated as a claim made on the date on which such notice was given . . . or the last day of the Policy period, whichever is earlier."  <u>See</u> <u>supra</u> at 21.  In other words, the subsequent claim -- which is not limited to a claim made after expiration of the policy -- will relate back to the date of the notice of circumstances. PCIC states this was the intended meaning of the provision, and that its member/insureds operated with this understanding. (Paper 109 ¶ 97.)  <u>Compare</u> <u>In re Ambassador Group, Inc.</u>, 830 F. Supp. 147 (E.D.N.Y. 1993) (discussing a provision that stated such claims "will be treated as made during the <u>currency [of the</u> <u>policy]</u>") <u>with</u> <u>F.D.I.C. v. Mijalis</u>, 15 F.3d 1314, 1329 (5th Cir. 1994) ("shall . . . be treated as a claim made <u>during the policy</u> <u>year</u> in which such notice is given") <u>with</u> <u>Gilliam v. Am. Cas.</u> <u>Co.</u>, 735 F. Supp. 345 (N.D. Cal. 1990) (provision stated claim would be deemed made <u>on the date notice was given</u> or the filing of the actual claim within the policy period, whichever was earlier) (emphases added).  In sum, PCIC's provision may be

41

meaningfully applied to deem claims made within a policy year, or the policy period as made on the earlier date on which the insured gave notice of circumstances of the potential claim.

Because the Court has determined that PCIC correctly assigned May 6, 1998 as the date of the LACERA claim under the notice-of-circumstances provision, the next question is whether ERC must indemnify PCIC for the claim under the 1993 Agreement and/or the 1997 Agreement.  Reinsurance contracts are distinct from the underlying insurance policies.  See Michigan Millers Mut. Ins. Co. v. N. Am. Reins. Corp., 452 N.W.2d 841 (Mich. Ct. App. 1990).  It should be noted, however, that the PCIC excess policies ERC agreed to reinsure explicitly incorporated the terms of the primary policy, including the notice-of-circumstances provision.[18]  (Paper 116, Ex. I, J, Clause V.)

In view of the fact that the reinsured excess policies incorporated the primary policy's notice-of-circumstances provision, the only remaining question is whether the 1993 and 1997 Agreements provide concurrent coverage as to claims made under the provision.  The 1993 Agreement states that the reinsurer accepts a portion of the risk of the "indemnity written," meaning the excess policy itself, and that it applies

---

[18]  As noted above, the excess policies also included a "discovery" provision.  See supra at 22-23.  Because courts are to ensure that contracts are interpreted in such a way as to give effect to each term to that none will be rendered meaningless, Town of Troy v. Am. Fid. Co., 143 A.2d 469, 473 (Vt. 1958), the Court finds that the discovery clause is an additional coverage-expanding provision, beyond the incorporated notice-of-circumstances provision.  See Ostrager & Newman § 4.02[b] at 115.

to "claims made" "under policies" covered by the Agreement. Additionally, PCIC was obliged under the Agreement to provide notice to ERC of both claims and potential claims.

In the discussion of the reinsurance limit in Section I, however, the Court found that there are material facts in dispute regarding the parties' intention for the meaning of "indemnity written" and the extent to which they intended the 1993 Agreement to provide concurrent coverage with the underlying excess policy. The parties continue this dispute about the existence of industry customs as to concurrency into the date-of-claim filings.  (Paper 108 at 13; Def.'s Reply Supp. Summ. J., Paper 133 at 4.) Therefore, because there are material facts in dispute as to the parties' intent, the Court cannot determine whether the 1993 Agreement covers claims under the notice-of-circumstances provision.

Finally, the Court must consider whether the LACERA claim is covered by the 1997 Agreement.  The 1997 Agreement is a reinsurance facultative certificate, and as such, is written in standard form language, unlike the 1993 Agreement.[19]  The 1997 Agreement states that it applies "as respects claims first made against the insured during the Certificate period," and that PCIC

_____

[19]  Reinsurance contracts vary considerably but there are two basic types, although the delineation between them is not fixed:  treaty and facultative certificates.  The 1993 Agreement is a treaty.  Treaties tend to contemplate an ongoing relationship in which the reinsurer agrees to assume all risks written by the ceding company within a specified class of business. The 1997 Agreement is a facultative certificate.  "Fac certs" are usually for one year and limited to a specified policy or policies.  See Ostranger & Newman § 15.03[a]; Reinsurance 17 (Strain, ed., 1997).

is to "give prompt notice to [ERC] of any occurrence, event, or development . . . which might result in a claim for indemnity hereunder."  It contains no other relevant language, nor does it contain a "follow the settlements," "following form" provision, or exceptions to concurrency.  See Travelers Cas. & Sur. Co., 392 F. Supp. 2d at 665 (citing Travelers Cas. & Sur. Co. v. Gerling Global Reins. Corp. of Am., 419 F.3d 181 (2d Cir. 2005)) (holding that where a certificate contains a "follow the form" clause, concurrency is presumed between the terms of the certificate and the underlying policy).

The provisions of the 1997 Agreement, when read together, are ambiguous as to whether the Agreement covers a claim made pursuant to the notice-of-circumstances provision.  Therefore, the Court turns to extrinsic evidence.  The parties dispute whether the "follow the form" concept inheres in reinsurance generally, and whether there is an industry custom by which areas of nonconcurrency are explicitly stated.  See supra at 14-18. Therefore, because there are material facts in dispute as to the parties' intent, the Court cannot determine whether the 1997 Agreement covers claims under the notice-of-circumstances provision.

Consequently, because the Court finds that PCIC properly assigned the LACERA date of claim under the primary policy's notice-of-circumstances provision, but that material facts are in dispute as to whether the claim is covered by the 1993 and 1997

44

Agreements, ERC's motion for partial summary judgment as to the
LACERA date of claim is DENIED.

    2.  <u>The Raytheon Date of Claim</u>

PCIC treated the Hughes and Raytheon claims as a single
claim, dated March 6, 1998 -- the date of the Hughes-Towers
Perrin tolling agreement -- in reliance on Section IV.2(b) of the
PCIC primary policy, which provided that "all claims arising out
of the same act or related acts of the assured firm shall be
considered a single claim and only one sum insured is applicable
to the total amount of such claim, even if such claims occur in
different policy years."  The issue here is whether PCIC properly
assigned the same date of claim to the Raytheon and Hughes claims
on the basis of the Hughes-Towers Perrin tolling agreement
because the claims arose out of the "same act or related acts."
If the answer is yes, then the Court must determine if ERC is
obligated to indemnify the claim under the reinsurance
Agreements.

The first inquiry is whether PCIC's initial assignment of
the Raytheon date of claim as the date of the Hughes-Towers
Perrin's tolling agreement was appropriate.  ERC argues that the
correct date of claim for the Raytheon claim is not March 6,
1998, the date of the Hughes-Towers Perrin tolling agreement, but
November 17, 1999, the date Raytheon first asserted its claim
against Towers Perrin when it filed suit against Towers Perrin.

ERC cites for support <u>Andy Warhol Found. for the Visual Arts,</u> <u>Inc. v. Fed. Ins. Co.</u>, 189 F.3d 208 (2d Cir. 1999).

The <u>Warhol</u> court held that a tolling agreement between a photographer and the Foundation, tolling the limitations period for copyright claims by the photographer or his "heirs or assigns" against the Foundation, did not establish the Foundation's awareness of Time, Inc.'s copyright infringement claims against the Foundation based on the same alleged misappropriation, so as to trigger the Foundation's obligation to give notice of its liability to Life to its insurer.  <u>Id.</u> at 217. Unlike in <u>Warhol</u>, however, where the tolling agreement made no reference to Time and its claims, <u>id.</u>, the Hughes-Towers Perrin tolling agreement explicitly includes Raytheon, as Hughes' "transferee," and its claims.  Although Raytheon was not a party to the tolling agreement, the fact that the agreement mentioned Raytheon's claims was enough to trigger Towers Perrin's duty to report to PCIC the "circumstances" of its potential liability to Raytheon.  Therefore, PCIC correctly assigned the date of the tolling agreement as the date of a potential claim from Raytheon.

The Court must next determine whether PCIC was correct to maintain the Hughes and Raytheon claims as a single claim, "arising out of the same act or related acts."  Unlike the <u>Warhol</u> court, which considered the question of whether two claims were "identical," 189 F.3d at 217, the concern here is whether the Hughes and Raytheon claims both "arise out of" the same or

46

"related" acts by Towers Perrin.  The Second Circuit has held "arises" out of indicates a causal connection, while "related" more broadly means "in connection with," "associated with," and "with reference to."  <u>Coregis Ins. Co. v. Am. Health Fdn., Inc.</u>, 241 F.3d 123, 128-29 (2d Cir. 2001) (interpreting an insolvency exclusion term); <u>see also</u> <u>Gregory v. Home Ins. Co.</u>, 876 F.2d 602, 605-606 (7th Cir. 1989).

Preliminarily, the Court finds that the limit term at issue here is not ambiguous.  PCIC apparently intended to give broad meaning to this term limiting its liability.  ERC argues, however, that the Hughes and Raytheon claims arose out of events different in time, personnel, and damages, and the lawsuits involved different claims.  (Paper 95 at 19.)  PCIC maintains that since Towers Perrin gave notice of the circumstances of potential claims from both Hughes and Raytheon together, and PCIC accepted them as a single claim, there was no basis to later separate the claims.  (Paper 109 ¶¶ 159, 160, 162.)

As described briefly above and in the parties' voluminous filings, Towers Perrin allegedly failed to properly calculate retirement benefits for Hughes retirees in compliance with Section 415 of the tax code.  This failure formed the basis of the Hughes lawsuit.  The Raytheon lawsuit alleged that Towers Perrin used unreasonable assumptions in valuing the estimated liabilities of certain Hughes pension plans, and that the Section

47

415 issue, which was part of those pension evaluations, caused additional increased costs for Raytheon.

The Court finds that Hughes and Raytheon's claims arose out of the same act -- the Section 415 failure -- or related acts -- the greater pension evaluations -- and therefore were properly treated as a single claim.  Both claims were causally related to Towers Perrin's conduct regarding the Section 415, as acknowledged by tolling agreement itself, and both lawsuits are related to the alleged Section 415 failure by the very wording of the complaints, which explicitly refer to, discuss, and seek redress for that failure.

Having determined that PCIC was correct to assign March 6, 1998 as the Raytheon date of claim, the Court must determine whether ERC is obligated to indemnify PCIC for the claim under the 1993 and 1997 Agreements.  Again, the Court notes that the Agreements reinsured the excess policies, which explicitly incorporated the primary policy's terms, without excepting the "related acts" provision.  (Paper 116, Ex. I, J, Clause V.) Again, however, the parties dispute the degree to which the 1993 and 1997 Agreements provided concurrent coverage.

Because the Court finds that PCIC properly assigned the Raytheon date of claim under both the primary policy's notice-of-circumstances and "related acts" provisions, but material facts remain in dispute as to whether ERC must indemnify the LACERA

claim, ERC's motion for partial summary judgment on the Raytheon date of claim is DENIED.

III. <u>ERC's Motion for Summary Judgment on Tortious Bad Faith (Paper 92)</u>

PCIC's second cause of action against ERC is for tortious bad faith, and ERC moves for partial summary judgment on this claim.  ERC argues that Vermont does not recognize a tort claim for bad faith.  PCIC responds that its claim arises in contract. <u>See</u> <u>Logan v. Bennington College Corp.</u>, 72 F.3d 1017, 1025 (2d Cir. 1995) (implied covenant of good faith and fair dealing prevails in every contract); <u>Murphy v. Stowe Club Highlands</u>, 761 A.2d 688, 696 (Vt. 2000) (providing punitive damages in "extraordinary" breach of contract cases where "the breach has the character of a wilful and wanton, or fraudulent tort"); <u>see also</u> <u>Stonewall Ins. Co. v. Argonaut Ins. Co.</u>, 75 F. Supp. 2d 893 (N.D. Ill. 1999) (concluding that social policy considerations supporting recovery of tort damages in breach of contract actions are absent in the reinsurance setting).  Because the parties dispute material facts regarding whether ERC acted in good faith, ERC's motion for summary judgment on the bad faith claim is DENIED.

ERC alternatively moves to bifurcate at trial PCIC's breach of contract and bad faith claims.  Courts have discretion to order separate trials where it will further convenience, avoid

prejudice, and promote efficiency.  Fed. R. Civ. P. 42(b); <u>see</u>, <u>e.g.</u>, <u>Amato v. City of Saratoga Springs</u>, 170 F.3d 311, 316 (2d Cir. 1999).  In this case, because the factual issues regarding bad faith are interwoven with the facts of the breach of contract claim, and it is likely that the Court can instruct the jury so as to avoid prejudice, ERC's motion to bifurcate is DENIED.


IV.  <u>ERC's Motion to Strike Certain Evidence (Paper 138)</u>

ERC moves to strike one affidavit and parts of another deposition offered by PCIC in opposition to ERC's summary judgment motions.  PCIC's evidence purports to establish through expert testimony the industry custom that reinsurance contracts typically expressly state any nonconcurrency with underlying policies, and that the duty of utmost good faith in the reinsurance relationship requires that the reinsurer alert the reinsured to any nonconcurrency and to any claims received that are not covered or may not be covered.  ERC's makes three arguments in support of its motion, which the Court addresses in turn.

A.  <u>Admissibility under Daubert</u>

ERC first argues that the testimony is not admissible under <u>Daubert</u>.  Vermont adopted <u>Daubert</u>'s flexible standard for the admissibility of expert testimony, under Fed. R. Evid. 702, governed by two principles:  reliability and relevance.  <u>State v. Streich</u>, 658 A.2d 38, 46-47 (Vt. 1995) (adopting and explaining

the standard in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993)).  Under Daubert, courts measure reliability by considering four nonexclusive factors:  whether the testimony (1) is capable of being tested, (2) has been subjected to peer review and publication, (3) has a known rate of error, and (4) has been generally accepted in the relevant community.  USGen New England, Inc. v. Town of Rockingham, 862 A.2d 269, 275 (Vt. 2004) (citing Daubert, 509 U.S. at 593-94 and noting that Vermont has also adopted Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999), extending Daubert to non-scientific expert testimony).  Relevancy is essentially determined by considering if the expert's testimony "will assist the trier of fact to understand or determine a fact in issue."  Usgen, 862 A.2d at 275.

Although the parties disagree in conclusory fashion over whether the expert testimony at issue meets any of the four factors, the better focus is on the general principles of reliability and relevance, with reference to other reinsurance cases.  See State v. Kinney, 762 A.2d 833, 842 (Vt. 2000).

As to reliability, both experts base their opinions on experience working and researching in the field, and on the facts of the case.  (Pl.'s Resp., Paper 154 at 6; Affidavit of Richard T. Waterman, Paper 121 ¶ 9.)  This basis has sufficed in other reinsurance disputes.  See N. River Ins., 197 F. Supp. 2d at 982, 984; TIG Premier Ins. Co. v. Hartford Acc. & Indem. Co., 35 F. Supp. 2d 348 (S.D.N.Y. 1999) (although neither court addressed

<u>Daubert</u> factors); <u>see also</u> <u>Crowley v. Chait</u>, 322 F. Supp. 2d 530, 539 (D.N.J. 2004) (denying motions to strike expert evidence in insurance case on grounds that it failed to meet <u>Daubert</u>'s reliability test because, "[i]n such cases of nonscientific testimony, the emphasis is placed not on the methodology of the expert testimony, but on the professional and personal experience of the witness").

The Court notes that Mr. Waterman does not appear to base his testimony on any reference materials or treatises (Paper 121 ¶ 9), and Mr. Stewart refers to his own publications and to scholarly literature generally, but not to specific treatises (Affidavit of Cassandra C. Shivers, Paper 118 Ex. P at 63-65; Affidavit of Bruce Engel, Paper 162 Ex. A at 8). At least one court decided to strike expert insurance evidence that was "not tethered to any independent authority," such as a treatise or industry code of conduct. <u>N. Star Mut. Ins. Co. v. Zurich Ins. Co.</u>, 269 F. Supp. 2d 1140, 1148 (D. Minn. 2003) (denying expert evidence on this and other grounds). Because Mr. Waterman and Mr. Stewart both have lengthy experience and professional involvement in the reinsurance field, however, their testimony appears to match the reliability of that in other reinsurance disputes.

As to relevancy, Mr. Waterman and Mr. Stewart appear to provide testimony that would help the trier of fact understand reinsurance and how the alleged customs may affect the contracts

at issue.  Despite the testimony's lack of reference to specific facts and sources, it may prove useful to the layperson.  As the Second Circuit noted while interpreting an ambiguous contract, it is hard to imagine how such a reinsurance dispute could be decided without admitting evidence of custom and practice. Travelers Indem. Co. v. Scor Reins. Co., 62 F.3d 74, 78 (2d Cir. 1995) (affirming admission of expert testimony about reinsurance practice concerning notice of occurrence, where testimony was relevant to interpret ambiguous contract provision and "not an effort to persuade the jury to ignore the contract").

Because the expert testimony appears to be reliable and relevant as compared to testimony in other reinsurance and insurance disputes, ERC's motion to strike the evidence is DENIED to the extent that the expert testimony meets the Daubert standard.

B.    Inadmissible Legal Conclusions

ERC claims that Mr. Waterman's affidavit includes three inadmissible legal conclusions:

- "It is my opinion that the plain language of the 1993 Agreement stipulates emphatically that the reinsurance coverage pertains to each policy issued by PCIC that became effective after the effective date and prior to the termination date of the 1993 Agreement."  (Paper 121 ¶ 13.)

- "[I]t is my opinion that the 1993 Agreement affords, and in accord with reinsurance industry custom and practice should

be understood to provide reinsurance indemnity for all
policies issued to each insured during the period the 1993
Treaty Agreement was in effect."  (Paper 121 ¶ 13.)

· "It is also my opinion that ERC's argument that the dates of
claim assigned to the LACERA and Raytheon claims are
improper because they should have been assigned to later
policy periods, which it raised for the first time in
October 2003 -- over 5½ years after PCIC had first notified
ERC of the claims and assigned the dates of claims -- is
contrary to the reinsurance industry custom, practice, and
standards and does not conform with ERC's obligation of
utmost good faith to PCIC."  (Paper 121 ¶ 16.)

PCIC concedes that Mr. Waterman opined on ultimate issues but
maintains that "the opinions are useful because he stated the
facts he relied upon in forming those opinions."  (Paper 154 at
6.)  PCIC suggests, however, that Mr. Waterman's statements are
opinions not couched in definitions based on judicial
interpretations but based on his review of "documents and
depositions in this case" and "the course of conduct of the
parties in subsequent years," viewed in the light of his
understanding of industry custom and practice.  (Paper 154 at 7.)

"[T]estimony in the form of an opinion or inference
otherwise admissible is not objectionable because it embraces an
ultimate issue to be decided by the trier of fact."  Fed. R.
Evid. 704(a); Soutiere v. Soutiere, 657 A.2d 206, 208 (Vt. 1995).

Expert testimony, however, that usurps the role of the jury in applying the law to the facts before it by definition does not aid the jury in making a decision; rather, it undertakes to tell the jury what result to reach.  Nimely v. City of New York, 414 F.3d 381, 397 (2d Cir. 2005) (internal quotations and citations omitted).

Most instructive in the reinsurance context is North River Insurance, 197 F. Supp. 2d 972, where the Ohio court considered motions to strike similar expert testimony in the context of a suit against a reinsurer for breach of contract arising out of the reinsurer's refusal to pay claims.  See also Nuvest, S. A. v. Gulf & Western Indus., Inc., 649 F.2d 943 (2d Cir. 1981) and Marx & Co. v. Diners' Club Inc., 550 F.2d 505 (2d Cir. 1977) (providing general guidance on inadmissible opinion testimony). The North River court excluded the testimony where the parties based their opinions on case law and legal standards, but allowed the testimony where the experts based their opinions on facts of the case, experience in the industry, and their own research of reinsurance practices.  197 F. Supp. 2d at 982-84.

Mr. Waterman's statements appear not to be based on case law or legal standards but rather on his knowledge of the facts of the case, his experience, and his understanding of industry custom.  (Paper 121 ¶ 9.)  The first bulleted statement above might be read as a legal determination that the contract is unambiguous.  See Luneau, 750 A.2d at 1033-34 (question of

whether a contract term is ambiguous is a matter of law for the
court to decide).  Mr. Waterman made the statement, however, in
the middle of a paragraph in which he opined that if ERC intended
more limited coverage, ERC would have been required by industry
custom to make such restrictions explicit to PCIC.  (Paper 121 ¶
13.)  Insofar as the statement is intended as a factual statement
concerning prevailing reinsurance practices, the statement is an
admissible factual description.  To the extent that it may be
read as an opinion on the ultimate legal issue, it is not
admissible.  See N. River Ins., 197 F. Supp. 2d at 982-84.

In the second and third bulleted statements above, Mr.
Waterman explicitly discusses "industry custom" as it applies to
the parties here.  To the extent that the statements are intended
as facts concerning prevailing reinsurance customs, they are
admissible as expert opinion testimony.  To the extent that they
may be read as opinions on the ultimate legal issues before the
Court, they are not admissible.  In accordance with the findings
above, ERC's motion to strike on this ground is DENIED in part
and GRANTED in part.

  C. Sufficiency

ERC argues that PCIC's experts' testimony is insufficient to
establish the reinsurance industry customs at issue.  (Def.'s
Mot. Strike, Paper 138 at 3-7; Def.'s Reply in Supp., Paper 157
at 3-5.)  Because the Court found that PCIC had shown the
existence of genuine issues of fact in dispute as to the parties

intent for the 1993 Agreement's limit and the import of such customs in this case, the Court DENIES without prejudice to renew at the time of trial as to the sufficiency of the expert testimony to establish industry customs.  See TIG Premier Ins. Co. v. Hartford Acc. & Indem. Co., 35 F. Supp. 2d 348, 350 (S.D.N.Y. 1999).

### Conclusion

For the reasons stated above, ERC's motions for partial summary judgment as to the reinsurance limit (Paper 98), as to the dates of claim (Paper 95), and as to tortious bad faith (Paper 92) are DENIED; ERC's alternative motion to bifurcate at trial the bad faith claim (Paper 92) is also DENIED.  ERC's motion to strike certain evidence (Paper 138) is DENIED to the extent that the evidence of industry custom is admissible because the contract is ambiguous; DENIED as to Daubert concerns; DENIED in part and GRANTED in part as to inadmissible legal conclusions; and DENIED without prejudice to renew at time of trial as to sufficiency of the expert testimony.

In view of the extensive discovery completed since the ENE session in July 2004, it is hereby ORDERED that the parties shall conduct a second ENE session with Leo A. Bisson, Jr., Esq. prior to May 1, 2006.  They shall share in payment of compensation to the Evaluator pursuant to Local Rule 16.3(d)(2), and shall inform the Court in writing, on or before March 20, 2006, of the date

and time selected for the additional session.  Further, the parties are informed that this case will be placed on the first civil trial calendar after May 1, 2006.

IT IS FURTHER ORDERED that the Clerk of Court serve copies of this order electronically, or by United States mail or facsimile, upon attorneys of record for the parties appearing in this case and Attorney Bisson.

SO ORDERED.

Dated at Brattleboro, Vermont, this 8th day of March, 2006.


/s/ J. Garvan Murtha
J. Garvan Murtha
United States District Judge